**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Jaime Edmondson Longoria, et al.,

Plaintiffs,

v.

Kodiak Concepts LLC, et al.,

Defendants.

No. CV-18-02334-PHX-DWL

**ORDER**

In advance of the hearing on March 10, 2021, the Court wishes to provide the parties with its tentative ruling on the pending *Daubert* motions (Docs. 45, 51, 52). It is possible that, before the hearing, the Court will also issue a tentative ruling on the pending summary judgment motions (Docs. 49, 50). This is, to be clear, only a tentative ruling. The point of providing it beforehand is to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize their ability to address any perceived errors in the Court's logic. This is not an invitation to submit additional evidence or briefing.

Dated this 1st day of March, 2021.

Dominic W. Lanza
United States District Judge

TENTATIVE RULING

Pending before the Court are the parties' motions to exclude expert opinions. (Docs. 45, 51, 52.) For the following reasons, Defendant's motions to exclude the opinions of Martin Buncher (Doc. 51) and Stephen Chamberlin (Doc. 52) are denied and Plaintiffs' motion to exclude the opinion of Michael Einhorn (Doc. 45) is granted. The parties' cross-motions for summary judgment will be addressed by separate order.

**BACKGROUND**

Defendant Kodiak Concepts, LLC ("Defendant") owns and operates a strip club called The Great Alaskan Bush Company Gentlemen's Club ("the Club") in Phoenix, Arizona. (Doc. 1-3 ¶¶ 19-20.) Plaintiffs are "models, business women, and well-known social media personalities." (*Id.* ¶ 1.) This case arises from Defendant's unauthorized use of Plaintiffs' images and likenesses in advertisements appearing on the Club's social media accounts. (*Id.* ¶ 3.) This is one of several similar cases in this district.[1]

On June 1, 2018, Plaintiffs filed suit in Maricopa County Superior Court. (Doc. 1-3 at 2-21.) On July 25, 2018, Defendant removed the case to federal court.[2] (Doc. 1.)

In their complaint, Plaintiffs allege the following misuses of their images and likenesses:

- On or about August 8, 2015, Defendant posted Iglesias's image on the Club's Facebook page. (Doc. 1-3 ¶ 41.)
- On or about November 19, 2016, Defendant posted Pinder's image on the Club's Instagram page. (*Id.* ¶ 40)
- On or about April 18, 2017, Defendant posted Hinton's image on the Club's

[1] All cases relate to the unauthorized use of models' photographs and raise similar claims. *See, e.g.*, *Skinner et al v. Tuscan Incorporated et al*, No. CV 18–319–RCC (D. Ariz. July 2, 2018); *Mitcheson v. El Antro, LLC*, No. CV 19–1598–GMS (D. Ariz. March 8, 2019); *Pepaj v. Paris Ultra Club, LLC*, No. CV 19–1438–MTL (D. Ariz. March 1, 2019); *Ratchford v. Dalton Corp.*, No. CV–19–1421–SRB (D. Ariz. Feb. 28, 2019); *Longoria v. Whitefeather Ventures, LLC*, No. CV–18–394–SHR (D. Ariz. Aug. 10, 2018); *Gray v. LG&M Holdings, LLC*, No. CV–18–2543–SRB (D. Ariz. Aug. 10, 2018); *Takeguma v. Freedom of Expression, LLC*, No. CV–18–2552–MTL (D. Ariz. Aug. 10, 2018); *Pinder v. 4716 Inc.*, No. CV–18– 2503–RCC (D. Ariz. Aug. 7, 2018); *Electra v. Id. Business Holdings*, LLC, No. CV–18– 1604–SRB (D. Ariz. May 25, 2018); *Geiger v. Creative Impact Inc.*, No. CV–18–1443– JAT (D. Ariz. May 10, 2018).

[2] This case was reassigned to the undersigned judge on October 31, 2018. (Doc. 18.)

Facebook page. (*Id.* ¶ 39.)

- On May 3, 2017, Defendant posted Canas's image on the Club's Yelp page. (*Id.* ¶ 42.) On May 4, 2017, and December 16, 2017, Defendant posted Canas's image on the Club's Instagram page. (*Id.*) Between May 30, 2017, and September 18, 2017, Defendant posted Canas's image on the Club's Facebook page ten different times. (*Id.*)
- On August 21, 2017, Defendant posted Longoria's image to the Club's Facebook page twice. (*Id.* ¶ 38.)

Plaintiffs allege that the use of their images on the Club's social media accounts was without permission or consent, was for commercial purposes, and created the false perception that they had agreed to promote or endorse the Club. (*Id.* ¶¶ 38-41.) Plaintiffs also allege that Defendant never hired, contracted with, employed, or paid them. (*Id.*)

All five Plaintiffs assert claims for false association and false advertising under the Lanham Act, 15 U.S.C. § 1125(a). (*Id.* ¶¶ 56-74.) Four of the Plaintiffs (all but Iglesias) also assert state-law claims of misappropriation of likeness (*id.* ¶¶ 43-55) and false light invasion of privacy (*id.* ¶¶ 75-84).

On March 30, 2020, the Court issued an order denying Defendant's motion to sever Plaintiffs' claims. (Doc. 43.)

On July 31, 2020, Plaintiffs filed a motion for summary judgment (Doc. 49) and a motion to exclude the expert opinions of Michael Einhorn (Doc. 45). That same day, Defendant filed a motion for summary judgment (Doc. 50) and motions to exclude the expert opinions of Martin Buncher (Doc. 51) and Stephen Chamberlin (Doc. 52). All five motions are now fully briefed.

On March 1, 2021, the Court issued a tentative order addressing the three motions to exclude expert testimony. (Doc. 69.)

On March 10, 2021, the Court heard oral argument.

…

…

## DISCUSSION

I. Legal Standard

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted). Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Cor*p., 161 F.3d 1226, 1231 (9th Cir. 1998).

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it "has any tendency to make the existence of any fact that is

of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Nevertheless, the Court serves an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has

been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."). The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments.

II. Martin Buncher

One of the elements of Plaintiffs' false association claim under the Lanham Act is that the usage in question "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). In an effort to satisfy this element, Plaintiffs retained Martin Buncher to "conduct a marketing research survey" intended to "measure the degree of confusion which may have been created by the use of [Plaintiffs] in the Internet advertising of the Great Alaskan Bush Company relative to their acting as spokespeople representing the brand, endorsing the brand, and participating in the activities at the Clubs and/or the life style represented in the advertisements, and/or being otherwise affiliated or associated with the brand." (Doc. 51-2 at 4, 6.) Buncher's ultimate conclusion,

based on the survey results, is that viewers of the advertisements were "very highly likely" to believe that Plaintiffs (1) have "some affiliation, connection or association" with Defendant's strip club, (2) "have agreed to sponsor, endorse, or promote" it, (3) "approved of the use of their images" in the advertisements, (4) "probably enjoy[] a lifestyle like that reflected in" the advertisements, (5) "probably participat[e]" in the strip club's events or activities, and (6) "hav[e] been paid to be in the ads in which they appear." (*Id.* at 24.)

Defendant moves to preclude Buncher from presenting these opinions at trial. (Doc. 51.) The sole ground on which Defendant seeks exclusion is that Buncher's survey is marred by the following six "methodological flaws":

> (1) the Survey does not contain a control group;
>
> (2) the Survey's purported "control" question is flawed because it alerts the respondents to the exact variable being measured;
>
> (3) the Survey's questions are largely improper, confusing, misleading, and include undefined and ambiguous terms;
>
> (4) the Survey does not instruct respondents not to guess and improperly omits the option to respond "don't know" or "no opinion";
>
> (5) the Survey relies on an unrepresentative sample and does not account for prior exposure to the advertisements; and
>
> (6) the Survey did not properly measure the relevant issue in the case.

(*Id.* at 2-3.) In the Court's view, the first five of these concerns address reliability while the sixth challenges the survey's relevance.

Generally, "survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal quotation marks and brackets omitted). "[T]echnical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Id.* (internal quotation marks omitted). Put another way, a court must answer the following "threshold question" when presented with survey evidence: "Is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles?" *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th

Cir. 2001). If so, "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Id.* *See generally Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Surveys are to be admitted as long as they are conducted according to accepted principles and are relevant. Challenges to survey methodology go to the weight given the survey, not its admissibility."); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (holding that objections as to "leading questions" and an unrepresentative sample "go only to the weight, and not the admissibility, of the survey"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility.").

Given these principles, Defendant's first five objections are unavailing. At bottom, Defendant's position is that the survey should be deemed unreliable due to technical flaws in how it was designed and implemented. Indeed, Defendant uses the label "methodological flaws" to describe its criticisms.[3] The problem with this approach is that, under Ninth Circuit law, "follow-on issues of methodology" only to go the weight of a survey, not its admissibility. *Click Billiards*, 251 F.3d at 1263.

It should be acknowledged that Ninth Circuit law sheds little light on how to distinguish between a flaw in a survey that shows it was not "conducted according to accepted principles" (a flaw that goes to admissibility) and a flaw that can be chalked up to a mere error of "methodology" or "survey design" (a flaw that only goes to weight). Presumably, some of the accepted principles of conducting surveys involve survey design and methodology. Nevertheless, it is unnecessary in this case to discern exactly how and where to draw the line between an "accepted principles" flaw and a "methodology" flaw because the Court is satisfied that Buncher's survey was conducted according to accepted principles. Buncher's report explains that "[t]he survey sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were

---

[3] Although Defendant's word choice is not determinative, the Court concludes that the label aptly characterizes these criticisms.

specifically designed in accordance with the generally accepted standards and procedures in the fielding of surveys set forth by the American Marketing Association, Marketing Research Association, CASRO and ESOMAR" and that the survey was also "designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's Manual for Complex Litigation, Fourth." (Doc. 51-2 at 6.) Defendant fails to controvert these assertions—among other things, Defendant does not dispute that the aforementioned entities are responsible for promulgating the generally accepted standards in the surveying field[4] and fails to show that Buncher's alleged "methodological flaws" are inconsistent with these entities' generally accepted standards.

Furthermore, Defendant's objections fall into categories broadly considered to be methodological flaws. Defendant's second, third, and fourth objections criticize the wording of the questions in Buncher's survey (or directions as to the acceptable answers), but any concerns as to "the format of the questions . . . bear on the weight of the evidence, not its admissibility." *Fortune Dynamic*, 618 F.3d at 1036. Defendant's fifth concern, that the survey sample was unrepresentative, has also been considered a methodological flaw. *Southland Sod Farms*, 108 F.3d at 1143 (objection "that the survey was only conducted in Southern California" went "only to the weight, and not the admissibility, of the survey"). Defendant's first concern, that the survey lacks a control group, appears to criticize "the manner in which it was taken." *Fortune Dynamic*, 618 F.3d at 1036. Again, it's difficult to differentiate between the "manner in which [a survey] was taken" and whether the survey was "conducted according to accepted principles," but case law suggests that the use or non-use of a control group falls into the former category. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1172 (9th Cir. 2007) (characterizing "failure to utilize a control group" as a "methodology" subject to impeachment); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002) (failure to use a control group "goes to the weight the Court is to afford the survey, rather than its

---

[4] To the contrary, Defendant cites the fourth edition of the Complex Litigation Manual as one of the authoritative sources. (Doc. 51 at 8.)

admissibility”).

The Court notes that many other courts have denied motions to exclude Buncher from presenting similar opinions in similar cases. *See, e.g.*, *Takeguma v. Freedom of Expression LLC*, 2021 WL 487884, *4 (D. Ariz. 2021) (“[Defendant’s] objections to the reliability of Mr. Buncher's report and survey go to the weight of his testimony, not its admissibility. The Court finds that Mr. Buncher conducted the survey according to accepted principles, and thus his report and survey are sufficiently reliable.”); *Pinder v. 4716 Inc.*, 2020 WL 6081498, *6 (D. Ariz. 2020) (same); *Geiger v. Creative Impact Inc.*, 2020 WL 3268675, *5 (D. Ariz. 2020) (same); *Edmondson v. Caliente Resorts, LLC*, 2017 WL 10591833, *11 (M.D. Fla. 2017) (same). And although a few courts have precluded Buncher from testifying,[5] those courts were not applying Ninth Circuit law and their decisions are not, in any event, binding here.

Finally, because Defendant’s sixth objection—“the Survey did not properly measure the relevant issue in the case” (Doc. 51 at 15-17)—can be categorized as an argument about relevance instead of reliability, the Court will analyze it separately. Defendant asserts that Buncher’s survey “included one ‘yes’ or ‘no’ question that asked the respondents if they ‘recognized the female or females shown in the ad,” but due to various purported inadequacies in the format of the questions, “[t]he only possible conclusion to be drawn from the [s]urvey is that the respondents cannot actually identify any of the Plaintiffs,” such that the survey is irrelevant as to the question of whether Defendant’s usages of Plaintiffs’ images were likely to cause confusion. (*Id.*) The Court disagrees. For each image, the survey asked its respondents, “Do you recognize the female in this ad?” (Doc. 51-2 at 76-79, 98-99, 123-24.) Moreover, the survey asked whether its respondents believed the women depicted in the ads probably do or do not “participate in the events or activities which take place in the club.” (*Id.* at 119.) The survey is relevant to the issue of likelihood of confusion.

[5] The two cases identified by Defendant are *Edmundson v. RCI Hospitality Holdings, Inc.*, 2020 WL 1503452, *6-8 (S.D.N.Y. 2020), and *Toth v. 59 Murray Enterprises, Inc.*, 2021 WL 438900, *19 (2d Cir. 2021).

III. Stephen Chamberlin

Plaintiffs retained their damages expert, Stephen Chamberlin, "to evaluate and value retroactively the compensation [Plaintiffs] would and should have received for the use of their respective images by [Defendant]." (Doc. 67 at 4.) Specifically, Plaintiffs asked Chamberlin "to determine the fair market value of [Plaintiffs'] images used by the Defendants in connection with the social media accounts for the Defendants' clubs" based upon Chamberlin's "professional experience in the industry." (*Id.*)

Chamberlin states in his report that his opinions "are based on a thorough review of the images and of supporting documentation, discussions with each [m]odel as well as agency representatives and other individuals in the modeling and talent industries . . . , assessment of current career station and personal factors that would impact a fair market value negotiation." (*Id.* at 5.) Chamberlin also relies upon his "28+ years of involvement in the model industry," "various booking terms and conditions set down by model agencies operating today (reflective of nearly every agency operating worldwide)," and "handbooks and guidelines published by advisory bodies such as The Association of Model Agents (AMA) [and] The Trade Association of The UK Model Industry." (*Id.* at 15.)

As for his methodology, Chamberlin explains:

> Determining the fair market value of the Defendants' use of the [m]odels' images necessarily requires me to attempt to recreate a negotiation process that did not occur. As such, my opinion as to the fair market value takes into consideration the factors normally considered by talent, clients and their respective agents and representatives when negotiating the value of the use of the models' images to promote the clients' goods or services. I must additionally account for the value inherent in the ability of each [m]odel to control the course and selection of business opportunities and, thus, the direction of their career which, in this case, was taken away by Defendants. These considerations are always a component of the process by which the parties to a negotiation would determine the value of the use of the [m]odel's image, and so must be considered when establishing fair market value.

(*Id.*) Chamberlin's report states that "[t]he predominant way an authorized user could obtain images for advertising is to negotiate a contract first and arrange a photo shoot," as "[m]odels do not sell pre-shot images for [a]dvertising." (*Id.* at 9.) "The basis of all negotiations in the industry is establishment of a 'day rate' for work by the model," which is "the base rate of compensation . . . for the [m]odel's time on the day of shoot" and is

based on various factors, including the model's desirability, the model's work history, and the nature of the business seeking the model's service. (*Id.*) For many of the considerations bearing on these factors, "there is no quantitive [sic] measure available to add or detract value to a [m]odel's day rate," but they nevertheless "should be considered in any negotiation." (*Id.*)

Chamberlin's report further explains that "[o]nce the Day Rate for each model has been established, the further costs to the [a]dvertiser depend[] upon the '[u]sages'"—the "way and method of use and distribution of images including but not limited to advertising, social media, third party promotion, branding, [b]illboard displays, coupons and more." (*Id.* at 6, 11.) Once the model and the advertiser negotiate a contract based on the day rate and the usages, "images produced from the photo shoot can be used in the particular [u]sage [c]ategories an unlimited time in the agreed time period." (*Id.* at 11.) Chamberlin's ultimate conclusion is that the fair market value associated with Defendant's use of the images of each Plaintiff is as follows: (1) Longoria: $60,000; (2) Pinder: $60,000; (3) Iglesias: $60,000; (4) Canas: $45,000; and (5) Hinton: $40,000. (*Id.* at 16.)

Defendant moves to preclude Chamberlin from presenting these opinions at trial. (Doc. 52.) As with Buncher, Defendant does not raise any objections concerning Chamberlin's qualifications and instead focuses on reliability.[6] More specifically, Defendant argues that Chamberlin's methodology "is fundamentally flawed and lacks any indicia of reliability" because "he fails to substantiate his calculations with any evidence or to provide any explanation as to how he came to his claimed damages calculations." (Doc. 52 at 2.) Defendant further argues that "Chamberlin does not explain how he calculates each Plaintiff's working day rate" and notes that Chamberlin seems to cherry-pick inflated figures—for example, he "calculate[s] a working day rate for Longoria that is more than she has ever earned for a single photoshoot," relies on Hinton's "single highest

---

[6] Defendant also asserts in conclusory fashion that exclusion is required under Rule 403 because any probative value is substantially outweighed by a risk of unfair prejudice (Doc. 52 at 2), but because Defendant fails to develop this argument in any depth, the Court does not consider it.

paying modeling contract in her career" and ignores her lower paid modeling jobs, focuses on noncomparable modeling jobs for Pinder, and makes similar alleged errors for Iglesias and Canas. (*Id.* at 6-9.) Defendant further argues that there is no basis for Chamberlin's conclusion that each Plaintiff's working day rate should be multiplied by various "arbitrary usages" such as advertising, branding, and social media. (*Id.* at 10.) Defendant notes that "not a single modeling contract disclosed in this case by any Plaintiff contains any such contemplation of 'usage' multipliers" and that the multipliers result in "overstated damages" that far exceed Plaintiffs' actual past earnings. (*Id.*)

These criticisms, to the extent they are offered as grounds for precluding Chamberlin from testifying, lack merit. Chamberlin's opinion that damages should be based upon a day rate for each model, amplified by the "usages," derives from his extensive experience in the modeling industry. Chamberlin has "worked as a full-time agent in the [m]odel and [t]alent industry since 1989," has served as the agency director at LA Models Management, "one of the world's largest and most respected talent agencies," founded his own talent and model agency, owns and directs a "worldwide model sourcing and management company" that "acts as a professional paid scout and development platform for [m]odels worldwide," has "represented over 5,000 [m]odels, personally discovered, started and developed the careers of more than 300 [m]odels, negotiated over ten thousand contracts, day rates and usages and [] billed personally or overseen bookings in excess of $100 million," and is "frequently called upon to speak at national and international modeling conventions." (Doc. 67 at 3.) As noted, "the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [non-scientific] testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter*, 373 F.3d at 1017. Thus, "[w]hen evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). Here, the Court is satisfied that Chamberlin's extensive experience in the modeling industry provides a sufficient

foundation for the reliability of his methodology.

Furthermore, Chamberlin's inclusion of various "usages" in his calculation of fair market value is supported by *The White Book: A Guide to Model Fees*, which is published by the Association of Model Agents. (Doc. 67 at 103, 105-06.) This publication states that the fee for "additional usages" is "an additional day rate per use." (*Id.* at 105.) Certain usages have different recommendations for negotiations—for example, "[a]d-shell, underground, public display posters" are listed at "an additional fee of 1.5 times the day rate." (*Id.* at 106.) This suggests that Chamberlin's methodology enjoys "general acceptance in the relevant expert community." *Kumho*, 526 U.S. at 156.

As for how Chamberlin determines the day rate for each model, he analyzes a variety of factors, each of which is somewhat intangible and difficult to quantify, by applying his years of experience to the hypothetical situation at hand—a negotiation that never took place. *Alaska Rent-A-Car*, 738 F.3d at 968 ("As in any damages case, the calculation had to address a hypothetical world that never existed . . . ."). Negotiations are not mechanical; they do not have predictable set outcomes ascertainable with mathematical precision. Thus, Chamberlin's mode of analysis is not, as Defendant suggests, "akin to giving an answer to a high school math problem without showing the 'work' for the answer given." (Doc. 59 at 2.) Chamberlin's analysis is a subjective process of weighing factors, some of which are not subject to easy quantification.

Moreover, Chamberlin does discuss, in some depth, the factors he considers when calculating the day rate for each Plaintiff (in a hypothetical world where each Plaintiff negotiated a contract with Defendant). (Doc. 67 at 30, 41, 56, 67, 80.) For example, Chamberlin explains that "Ms. Longoria was named Playboy Playmate of the Month," for which she was paid $25,000 "[f]or a one day shoot and 5 promotional [days] that were not utilized." (*Id.* at 30.) This title is "valuable in promoting Ms. Longoria further into her career and helped in obtaining her a role on the TV show 'The Amazing Race.'" (*Id.*) Chamberlin opines that it "is difficult to assign a numerical dollar value" to the "exposure Ms. Longoria achieved through this TV show," but this exposure "must be considered in

all negotiations for Ms. Longoria moving forward." (*Id.*) Chamberlin does not attempt to convert his analysis into a mathematical equation, but it is clear that Chamberlin is applying his experience to the facts of this case and that he explains his analysis in a relatively nuanced fashion, considering the unique career of each Plaintiff.

Finally, and perhaps most important, Defendant's assertion that Plaintiffs' past earnings—either the middle range or at least the highest point—should necessarily function as the ceiling for any reasonable damages estimate ignores a key point that Chamberlin emphasizes in his report: "most Models would not accept the assignment at any level of compensation" because "[t]he possible damage to a model's career and the stigmatism attached to being portrayed as an entertainer at a gentlemen's club would definitely affect and taint attitudes from future potential clients." (Doc. 67 at 5, 10.) Chamberlin explains, for example, that the image of Hinton was shot "for a lingerie company" and was "promoting a sexy costume," whereas Defendant's use of Hinton's image purported to promote "Ms. Hinton herself"[7] as "the product," that is, "as an employee of the club, as a stripper," which "demands a much higher day rate." (*Id.* at 41.) Chamberlin notes that "Ms. Hinton has stated that this is not an assignment she would accept or consent to." (*Id.*)

Judges have repeatedly rejected similar challenges to Chamberlin's opinions in similar cases. *See, e.g.*, *Geiger*, 2020 WL 3268675 at *7 ("Chamberlin's methodology is reliable as Chamberlin asserts his calculations and assumptions are based on his years of experience in the industry. Chamberlin applied his extensive experience in the field of modeling to the facts of this case and rendered an opinion. The proper vehicle for Defendant's challenges to Chamberlin's assumptions and any inconsistencies between his opinion and the record is on cross-examination."); *Mitcheson v. El Antro LLC*, 2020 WL 7075239, *3-4 (D. Ariz. 2020) (same); *Pinder v. 4716 Inc.*, 2020 WL 6081498, *7 (D.

---

[7] Chamberlin's report suggests that an appearance in which a model is promoted as herself in a manner *favorable* to her career—such as Pinder's appearances in "one of the most popular men's magazines in Great Britain and across Europe," which promoted Pinder "as a personality and a beauty" (Doc. 67 at 56)—is more desirable to the model, such that she might agree to the work for a lower day rate. Once such work becomes part of her portfolio, it increases her value and her leverage in future negotiations. (*Id.*)

Ariz. 2020) (same); *Skinner v. Tuscan, Inc.*, 2020 WL 5946897, *7 (D. Ariz. 2020) (same). Although those opinions are not binding here, they reinforce the Court's conclusion, in its role as "gatekeeper," that Chamberlin's methodology is sufficiently reliable to pass muster under Rule 702.

IV. Michael Einhorn

Defendant hired Michael Einhorn as a rebuttal expert on damages. (Doc. 66 at 3.) In the initial sections of his report, Einhorn identifies various reasons why he believes Chamberlin's damage calculations are flawed. For example, in section four (entitled "Summary of Conclusions"), Einhorn states that he "believe[s] that Mr. Chamberlin's report is flawed for eight reasons" and then proceeds to identify those reasons. (*Id.* at 9-11.) Similarly, in section eight (entitled "Summary of Common Points"), Einhorn explains why he believes that Chamberlin's individual valuation models for the Plaintiffs "share four common errors." (*Id.*at 52.) Finally, in section nine (entitled "Economic Valuation of Working Rate"), Einhorn provides his own competing methodology for calculating Plaintiffs' damages. (*Id.* at 55-62.) Einhorn's ultimate conclusion on this topic is that the fair market value associated with each challenged usage is either $240 or $480. (*Id.* at 62.)

Plaintiffs now move to preclude Einhorn from testifying at trial on the grounds that (1) his opinions are irrelevant, (2) he is not qualified, and (3) his methodology is unreliable. (Doc. 45.) As explained below, the Court disagrees with Plaintiffs' first two arguments but agrees with the third. Accordingly, Einhorn is precluded from testifying.

A. **Relevance**

Plaintiffs argue that Einhorn's report is too "flawed and biased" to be helpful to a trier of fact. (*Id.* at 14-15.) These arguments fail because, at bottom, they relate to the reliability of Einhorn's opinions, not their relevance. Einhorn's opinions relate to the topic of damages, which is clearly relevant.

B. **Qualifications**

Plaintiffs argue that "Einhorn is a professional expert witness who has never negotiated a modeling or talent contract in his life" and therefore lacks the "expertise

necessary to tell a jury the fair market value of each Plaintiff's image." (Doc. 45 at 10.) In response, Defendant contends that "Plaintiffs completely disregard and ignore Dr. Einhorn's applicable qualifications. First, Dr. Einhorn has a Ph.D. in microeconomics from Yale University. He has taught microeconomics at Rutgers University. Since 1981, Dr. Einhorn has been employed as a professional economist at Bell Telephone Laboratories and the Antitrust Division of the U.S. Department of Justice. He has also been employed as a valuation expert in litigation since 2002." (Doc. 54 at 6, citations omitted.) Defendant further contends that, "[a]s an expert economist, Dr. Einhorn's general professional background gives him the experience and training necessary to evaluate the specific issues raised in this case – namely, the valuation for the use of the subject photographs is in this case. There is no doubt that Dr. Einhorn is an expert in analyzing markets, prices, and valuations. Indeed, this is the basis of his education, training, and his entire career. Although he has never negotiated a modeling contract, Dr. Einhorn has acted as an economic consultant and expert witness in the areas of intellectual property, media, entertainment, technology, trademarks, publicity rights, and product design since 2001." (*Id.* at 7.)

The qualifications issue here presents a fairly close call. On the one hand, Einhorn has an impressive academic and professional background. In his report, Einhorn identifies his area of expertise as microeconomics, which he defines as "the study of processes used for the optimal allocation of scarce resources." (Doc. 66 at 55.) Einhorn also notes that he has repeatedly served "as a testifying economist in court cases involving the valuation of intellectual property." (*Id.* at 4.) The Court has no trouble concluding that Einhorn is an expert in the field of microeconomics.

On the other hand, it's not clear that being an expert in microeconomics is a sufficient qualification to render expert opinions on the specific issue posed in this case—how to place a fair market value on a strip club's unauthorized use of a model's photograph. Microeconomics is a very broad area of expertise, and "damages valuation," while somewhat narrower, is still quite broad. If an "area of expertise" has been defined so

broadly that it would render a person qualified to provide expert opinions in virtually any civil lawsuit where damages are sought, the "area of expertise" may be defined too broadly to be meaningful.

The Ninth Circuit has emphasized that Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). The proponent of expert testimony need only lay a "minimal foundation" of "knowledge, skill, experience, training, or education" in the topic at hand. *Id.* Although an expert may not offer opinions on matters "outside the areas of [the expert's] expertise," *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011), an expert's "lack of particularized expertise goes to the weight accorded [his or] her testimony, not to the admissibility of [his or] her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). However, "lack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839. Thus, the qualifications inquiry here boils down to whether Einhorn's opinions fall within his area of expertise, even though he lacks particularized experience and expertise with regard to the modeling industry (in which case he is qualified), or whether his opinions stray outside his area of expertise (in which case he is not qualified).

Applying these principles, the Court concludes that Einhorn is qualified to offer opinions in this case despite his lack of modeling-specific experience and expertise. In *Bitton v. Int'l Transp., Inc.*, 437 F.2d 821 (9th Cir. 1970), the Ninth Circuit addressed an analogous issue. There, the plaintiff argued that an expert witness "was not qualified to: (1) determine the characteristics of asphalt, (2) determine the effect upon asphalt of objects moving across it, (3) take photographs, and (4) make a chemical analysis of asphalt samples for the purpose of determining the direction of a physical body in making [a gouge mark]." 437 F.2d at 821 n.4. Although the witness had a Ph.D. in chemistry, had done previous analytical work for law enforcement agencies, and was educated in the fields of physics, chemistry, and geology, he "had no experience with, or particular knowledge of, asphalt,"

"had not previously had occasion to determine the direction of an object moving on an asphalt highway upon an analysis of the marks it produced," and had "no particular training in photomicrography, although he did have some experience in that field." *Id.* at 822. The Ninth Circuit held that although the witness "lacked training and experience in the particulars mentioned, there was reason to believe that his general scientific skills and techniques were sufficient to enable him to reach reliable conclusions with regard to the direction of the movement of the object that made the gouge." *Id.*

So, too, here. Although, as discussed below, Einhorn's lack of experience and specialized knowledge pertaining to the modeling industry raise serious questions about the reliability of his opinions in this case, he is broadly qualified to render such opinions.[8]

C. **Reliability**

In the portion of his report setting forth his valuation opinions (Doc. 66 at 56-62), Einhorn states that he began determining the market rate for each model by examining "the full text of xxxx[9] modeling contracts involving lingerie photoshoots" that he has "examined in other cases involving [the] modeling industry." (*Id.* at 56.) He insinuates that the contracts were with lingerie dealers. (*Id.*)

Einhorn states that "the viewed contracts generally are related to other litigation and are under confidentiality agreements," and therefore he "cannot disclose the specific contents in this report." (*Id.* at 57.) However, based on examining an unknown number of modeling contracts involving lingerie (possibly contracts with lingerie dealers), and without disclosing any of the figures or other content in these contracts, he "conclude[s] that a competitive Day Rate in the industry for a lingerie photoshoot ranged from $2,000 to $2,500 per full day." (*Id.*)

Einhorn also performed a Google search of the phrase "working day rates, models"

---

8 Plaintiffs also contend that no qualified expert would have written such an unreliable report: "Einhorn's abject lack of expertise is corroborated by his . . . conclusion and [what he did] in arriving at it." (Doc. 45 at 10.) But this is a roundabout way of attacking the reliability of the report, not the qualifications of the expert who wrote it. Additionally, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

9 The Court has no way of knowing what the "xxxx" signifies.

and received 3.37 billion search results. (*Id.*) Trusting, apparently, that the Google algorithm places the most important search results first, Einhorn selected three websites "[b]ased on their high positions in Google search results." (*Id.* at 57-58.) Einhorn summarizes what he learned from these websites. He observes that "glamour" modeling "is distinguished from fashion modeling for apparel catalogs, which is oriented around the sale of commercial apparel that may include clothing in general, including swimwear and lingerie," and is instead "focused on the physical appearance of the model" and conformity with "a certain aesthetic standard." (*Id.* at 59 n.8.) He also observes that "editorial" photos "are used to illustrate a story in a paper or magazine," whereas "catalog" photos "are used to sell products," for example, "a model dressed in a swimsuit on a beach would be catalog if the image were part of an advertisement in Vogue in order to promote sales of the swimwear." (*Id.* at 60 nn.10-11.)

Using the information he gleaned from two of those three websites, Einhorn constructed a chart of "possible" benchmarks in the modeling industry for hourly and daily rates in a variety of categories, shown (reformatted) here:

| | Hourly | Daily |
|---|---|---|
| Editorial | | $200 |
| Catalog | $150-$300 | $1,200-$3,500 |
| Fashion | $150-$250 | $1,200-$2,400 |
| Swimwear | | $500-$2,500 |
| Lingerie Editorial | | $400 |
| Lingerie Catalog | | $2400-$7,000 |
| Glamour Editorial | | $600 |
| Glamour Catalog | | $3,600-$10,500 |

(*Id.* at 60.)

Without identifying which category he believes would encompass (or at least be analogous to) posing in lingerie to advertise for a strip club—and without explaining the

rationale undergirding that undisclosed determination—Einhorn states:

> Along with the above contract information, the available public evidence confirms that a Day Rate of $2,400 is within the competitive range of a model's payment. From the above chart, lingerie payments can be extrapolated to a higher rate (e.g., $3,600 per day) by extrapolating from the lingerie rate of $2,400 a premium of 50 percent that prevails (supra) in a competitive market for adult photoshoots more related to nudity and straight glamour use.

(*Id.* at 61.)

Einhorn then states he "reviewed model testimony" from an unspecified source "that six to twelve final images could be expected in a day." (*Id.*) He also estimates that "each model would pay her agent a commission of twenty percent for arranging for her services." (*Id.*) He concludes that each Plaintiff would earn a day rate of $3,600, minus 20% for a subtotal of $2,880, which could be divided by six (assuming six photos were obtained from the photo shoot) making each photograph worth $480, or could be divided by twelve (assuming twelve photos were obtained from the photo shoot), making each photograph worth $240. (*Id.* at 62.) Einhorn adds that some models might "earn an unspecified premium," but he does not believe that Plaintiffs put forth evidence suggesting any Plaintiff would receive such a premium. (*Id.*)

Plaintiffs challenge the reliability of Einhorn's methodology. Plaintiffs first argue that "Einhorn did not analyze *Plaintiffs'* contracts, releases and earnings documents which were disclosed in this lawsuit, but rather allegedly analyzed undisclosed number of undisclosed modeling contracts involving undisclosed individuals for undisclosed lingerie clients." (Doc. 45 at 2.)

Although Rule 702 allows for expert testimony only if "the expert has reliably applied the principles and methods to the facts of the case," the Court assumes *arguendo* that relying on a body of modeling contracts other than Plaintiffs' own past contracts could be a reliable methodology, which could properly be admitted and then subjected to cross-examination. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). However, in this case,

Einhorn has not disclosed the number of contracts he reviewed or the content of those contracts. The Court agrees with Plaintiffs that "Defendant has failed to meet its burden of proving the reliability of Einhorn's opinion because both Plaintiffs and this Court are in the dark concerning what contracts Einhorn relied on or what they have to do with Plaintiffs." (Doc. 45 at 13.)

The Court has a duty to determine whether the contracts on which Einhorn relies could be a proper foundation for his expert opinion regarding the contracts Plaintiffs hypothetically might have entered into with Defendants. For Einhorn's opinion to be reliable, the contracts have to be reasonably comparable. *Cf. Joiner*, 522 U.S. at 144–45 ("Of course, whether animal studies can ever be a proper foundation for an expert's opinion was not the issue. The issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely. The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."); *Kumho Tire*, 526 U.S. at 153–54 ("[T]he specific issue before the court was . . . the reasonableness of using [an approach which is reasonable *in general*], along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*").

Defendant has not provided the information necessary for the Court to conclude that the contracts on which Einhorn relied provide a proper foundation for his opinion. The Court knows only that the contracts involve lingerie. Without knowing how many contracts Einhorn examined, the level of prestige or renown associated with the models, what kind of company hired them, the nature of the engagement, how the photographs were used, what the day rates were, or how much the models were paid in sum, the Court is unable to conclude that the sample size is adequate, that the contracts are minimally analogous, or that the day rate Einhorn calculates (which is identical for each Plaintiff) can reasonably be inferred from the day rates in those contracts. In short, the foundation for Einhorn's opinion, to the extent it rests upon these contracts, is entirely lacking.

Furthermore, to the extent the contracts were indeed with lingerie dealers, the obvious difference between advertising for lingerie sales and advertising for a strip club, in terms of detriment to a model's reputation and career, render the contracts—absent further analysis, which is lacking here—too dissimilar to the facts of this litigation for the day rates they contain to be applicable.

Plaintiffs also argue that Einhorn's internet research methods are unreliable. (*Id.*) As a general matter, conducting research and extrapolating from that research is—quite obviously—a reliable methodology. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1095 (9th Cir. 2014) (affirming denial of *Daubert* motion, which was premised in part on expert's reliance on internet research when conducting a market survey). However, it is possible to perform this task in such a manner that the methodology is rendered unreliable and the proposed expert testimony crosses the line from "shaky but admissible" into "unreliable nonsense opinions." *Alaska Rent-A-Car*, 738 F.3d at 969.

Einhorn's decision to rely on three websites solely because they were near the top of a list of 3.37 billion search results from a Google query is highly questionable, but the dubiousness of this research method, standing alone, might fall into the category of fodder for impeachment.[10] But the reliability issues here are compounded by the fact that Einhorn then makes extrapolation calculations based on this internet data that are not grounded in any sort of rational analysis. Although it is true that "[t]rained experts commonly extrapolate from existing data," "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Here, there is "simply too great an analytical gap" between the data Einhorn culled

[10] *But see Williams v. Illinois*, 567 U.S. 50, 80 (2012) ("[T]rial courts can screen out experts who would act as mere conduits for hearsay . . . . [A]n expert's opinion is only as good as the independent evidence that establishes its underlying premises."); Fed. R. Evid. 703 ("*If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject*, they need not be admissible for the opinion to be admitted.") (emphasis added).

from the internet and the opinion he proffers. *Id.* Einhorn states that "lingerie payments can be extrapolated to a higher rate (e.g., $3,600 per day) by extrapolating from the lingerie rate of $2,400 a premium of 50 percent that prevails (supra) in a competitive market for adult photoshoots more related to nudity and straight glamour use." (Doc. 66 at 61.) Einhorn does not explain how he determined that "the lingerie rate" is $2,400, but the Court surmises he took the figure from the low end of the $2,400-$7,000 range he listed for "Lingerie Catalog" on his chart. The Court also surmises that the "premium of 50%" refers to comparing the "Lingerie Editorial" and "Glamour Editorial" rates on his chart ($400 and $600 respectively) and the "Lingerie Catalog" and "Glamour Catalog" ranges on his chart ($2,400-$7,000 and $3,600-$10,500 respectively). But such a comparison is merely an observation—it explains nothing as to Einhorn's methodology. And unlike Chamberlin, whose background provides an experience-based foundation for drawing distinctions between different sorts of modeling work, Einhorn has no experience or expertise in these specific matters.

Essentially, although Einhorn mentions "the lingerie rate," Einhorn appears to have selected $3,600 as the day rate for each Plaintiff (before deducting 20%) because it is the low end of the range he listed in his chart for "Glamour Catalog." Einhorn does not provide any explanation as to why he relies on the lowest end of a wide range—in contrast, $10,500, which is at the high end of the range, is nearly three times as high as the $3,500 low end—nor does he discuss what variables could account for the range. Einhorn also does not offer any support at all for the proposition that the day rate can be divided by the number of photographs, such that a model would only be paid for a fraction of her day rate, depending on how many photographs were taken and how many of the taken photographs were used.

For these reasons, the Court concludes that Einhorn's opinions lack a "sufficient foundation" to be reliable. *Alaska Rent-A-Car*, 738 F.3d at 970. They fall "outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" *Kumho Tire*,

526 U.S. at 153. Thus, Einhorn may not testify at trial.[11]

Accordingly,

**IT IS ORDERED** that:

(1) Defendant's motion to exclude the opinions of Buncher (Doc. 51) is **denied**.

(2) Defendant's motion to exclude the opinions of Chamberlin (Doc. 52) is **denied**.

(3) Plaintiffs' motion to exclude the opinions of Einhorn (Doc. 45) is **granted**.

---

[11] Although Plaintiffs' preclusion motion focuses on the flaws in Einhorn's affirmative valuation opinions (Doc. 45 at 2 n.2), Plaintiffs make clear that they are seeking to preclude Einhorn from offering any of the opinions in his report at trial—among other things, they ask the Court to "strike" his report in its entirety (*id.* at 1) and incorporate by reference their other briefs that discuss the alleged flaws in Einhorn's other opinions (*id.* at 2 n.2). At any rate, the Court sees no meaningful way to distinguish between Einhorn's affirmative valuation opinions and Einhorn's opinions pertaining to Chamberlin—the latter are marred by the same foundational and methodological deficits as the former. Additionally, it would be anomalous to conclude that Einhorn's methodology is too flawed to allow him to present his affirmative opinions about how to value Plaintiffs' damages in this case while still allowing him to opine about why a different expert's valuation opinions, which are grounded in an acceptably reliable methodology, are wrong.