1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9    Jaime Edmondson Longoria, et al.,              No. CV-18-02334-PHX-DWL

10                Plaintiffs,                         **ORDER**

11   v.

12   Kodiak Concepts LLC, et al.,

13                Defendants.

14

15          Pending before the Court are the parties' cross-motions for summary judgment.

16   (Docs. 49, 50.)  For the following reasons, both motions are granted in part and denied in

17   part.

18                            **BACKGROUND**

19          Defendant Kodiak Concepts, LLC ("Defendant") owns and operates a strip club

20   called The Great Alaskan Bush Company Gentlemen's Club ("the Club") in Phoenix,

21   Arizona.  (Doc. 1-3 ¶¶ 19-20.)  Plaintiffs are "models, business women, and well-known

22   social media personalities."  (*Id.* ¶ 1.)  This case arises from Defendant's unauthorized use

23   of Plaintiffs' images and likenesses in advertisements appearing on the Club's social media

24   accounts.  (*Id.* ¶ 3.)  This is one of several similar cases in this district.[1]

25   ───────────────

26   [1]     All cases relate to the unauthorized use of models' photographs and raise similar
     claims.  *See Skinner et al v. Tuscan Incorporated et al*, No. CV 18–319–RCC (D. Ariz.
     July 2, 2018); *Mitcheson v. El Antro, LLC*, No. CV 19–1598–GMS (D. Ariz. March 8,
27   2019); *Pepaj v. Paris Ultra Club, LLC*, No. CV 19–1438–MTL (D. Ariz. March 1, 2019);
     *Ratchford v. Dalton Corp.*, No. CV–19–1421–SRB (D. Ariz. Feb. 28, 2019); *Longoria v.
     Whitefeather Ventures, LLC*, No. CV–18–394–SHR (D. Ariz. Aug. 10, 2018); *Gray v.
28   LG&M Holdings, LLC*, No. CV–18–2543–SRB (D. Ariz. Aug. 10, 2018); *Takeguma v.
     Freedom of Expression, LLC*, No. CV–18–2552–MTL (D. Ariz. Aug. 10, 2018); *Pinder v.*

On June 1, 2018, Plaintiffs filed suit in Maricopa County Superior Court.  (Doc. 1-3 at 2-21.)   On July 25, 2018, Defendant removed the case to federal court.[2]  (Doc. 1.)

In their complaint, Plaintiffs allege the following misuses of their images and likenesses:

- On or about August 8, 2015, Defendant posted Iglesias's image on the Club's Facebook page.  (Doc. 1-3 ¶ 41.)

- On or about November 19, 2016, Defendant posted Pinder's image on the Club's Instagram page.  (*Id*. ¶ 40)

- On or about April 18, 2017, Defendant posted Hinton's image on the Club's Facebook page.  (*Id*. ¶ 39.)

- On May 3, 2017, Defendant posted Canas's image on the Club's Yelp page.  (*Id*. ¶ 42.)  On May 4, 2017, and December 16, 2017, Defendant posted Canas's image on the Club's Instagram page.  (*Id*.)  Between May 30, 2017, and September 18, 2017, Defendant posted Canas's image on the Club's Facebook page ten different times.  (*Id*.)

- On August 21, 2017, Defendant posted Longoria's image on the Club's Facebook page twice.  (*Id*. ¶ 38.)

Plaintiffs allege that the use of their images on the Club's social media accounts was without permission or consent, was for commercial purposes, and created the false perception that they had agreed to promote or endorse the Club.  (*Id*. ¶¶ 38-41.)  Plaintiffs also allege that Defendant never hired, contracted with, employed, or paid them.  (*Id*.)

All five Plaintiffs assert claims for false association and false advertising under the Lanham Act, 15 U.S.C. § 1125(a).  (*Id*. ¶¶ 56-74.)  Four of the Plaintiffs (all but Iglesias) also assert state-law claims of misappropriation of likeness (*id*. ¶¶ 43-55) and false light invasion of privacy (*id*. ¶¶ 75-84).

---

*4716 Inc*., No. CV–18– 2503–RCC (D. Ariz. Aug. 7, 2018); *Electra v. Id. Business Holdings*, LLC, No. CV–18– 1604–SRB (D. Ariz. May 25, 2018); *Geiger v. Creative Impact Inc.*, No. CV–18–1443– JAT (D. Ariz. May 10, 2018).

[2]     This case was reassigned to the undersigned judge on October 31, 2018.  (Doc. 18.)

On March 30, 2020, the Court issued an order denying Defendant's motion to sever Plaintiffs' claims. (Doc. 43.)

On July 31, 2020, Plaintiffs filed a motion for summary judgment (Doc. 49) and a motion to exclude the expert opinions of Michael Einhorn (Doc. 45). That same day, Defendant filed a motion for summary judgment (Doc. 50) and motions to exclude the expert opinions of Martin Buncher (Doc. 51) and Stephen Chamberlin (Doc. 52). All five motions are fully briefed.

On March 1, 2021, the Court issued a tentative order addressing the three motions to exclude expert testimony. (Doc. 69.)

On March 9, 2021, the Court issued a tentative order addressing the cross-motions for summary judgment. (Doc. 70.)

On March 10, 2021, the Court heard oral argument on the motions to exclude expert testimony and the cross-motions for summary judgment. (Doc. 71.)

**DISCUSSION**

I.   Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

1    The party without the burden of persuasion at trial—usually the defendant—is entitled to

2    summary judgment where it establishes that the party with the burden of persuasion will

3    be unable to prove at least one element of its claim in light of the undisputed

4    facts.  *Celotex Corp.*, 477 U.S. at 322-23.  This distinction reflects that the burden is

5    ultimately on the proponent of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry

6    of summary judgment, after adequate time for discovery and upon motion, against a party

7    who fails to make a showing sufficient to establish the existence of an element essential to

8    that party's case, and on which that party will bear the burden of proof at trial.  In such a

9    situation, there can be 'no genuine issue as to any material fact,' since a complete failure

10   of proof concerning an essential element of the nonmoving party's case necessarily renders

11   all other facts immaterial.").

12   II.    Analysis

13          Plaintiffs and Defendant each request summary judgment in their favor on all

14   claims.  Given the significant overlap in analysis, the Court groups the parties' arguments

15   together by issue.

16          A.    **State Law Claims**

17          All Plaintiffs except Iglesias bring two Arizona common law claims: (1) "Violation

18   of Common Law Right of Publicity: Misappropriation of Likeness" (Count I)[3] and (2)

19   "False Light Invasion of Property" (Count III).  (Doc. 1-3 at 13-15, 18-19.)

20                 1.    Count I: Right Of Publicity

21                       a.    **Cognizability Under Arizona Law**

22          Defendant argues it is entitled to summary judgment on Count I because "Arizona

23   does not grant private, non-military individuals the right to sue in tort for the

24   misappropriation of that person's name or likeness."  (Doc. 50 at 6.)  Defendant notes that

25   "the most recent Revised Arizona Jury Instruction for invasion of privacy explicitly states

26   that there is no jury instruction for violation of the right of publicity for misappropriation

27   _____

28   [3]    The parties use the term "misappropriation" to describe what Arizona law and the
       Restatement (Third) of Unfair Competition § 46 term "appropriation."

- 5 -

of name or likeness because no such cause of action exists in Arizona."  (*Id.* at 6-7.)
Defendant further argues that the Arizona's legislature's enactment of A.R.S. § 12-761,
which "give[s] that right only to a specific class of citizen"—a soldier—is proof that the
legislature did not intend to confer such a right on other classes of citizens.  (*Id.* at 7.)

Plaintiffs, in turn, argue that the Arizona Court of Appeals specifically recognized
the cognizability of this theory of liability in *In re Estate of Reynolds*, 327 P.3d 213 (Ariz.
Ct. App. 2014), and that "since the *Reynolds* decision [many judges of] this Court ha[ve]
repeatedly reaffirmed that a right of publicity exists in Arizona."  (Doc. 49 at 6-7.)
Plaintiffs also contend that Defendant's reliance on the Arizona jury instructions is
misplaced because a "jury instruction-based argument [cannot] overcome the unmistakable
holdings of the District of Arizona and the Arizona Court of Appeals that a right of
publicity exists in Arizona" (Doc. 62 at 6-7) and that A.R.S. § 12-761 actually supports
their position because "the fact that Arizona's legislature enacted a statute to specifically
protect soldiers is strong evidence that Arizona chose *not* to disturb the well-settled
protections afforded under its common law to right of publicity claims" (*id.* at 6 n.3).

In reply, Defendant argues that *Reynolds*'s "ruminations on publicity were . . . dicta"
and that subsequent decisions concerning *Reynolds* by other judges of this Court were
wrongly decided.  (Doc. 63 at 2-4.)

The Court concludes that Plaintiffs have the better side of this argument.  "When
interpreting state law, a federal court is bound by the decision of the highest state court."
*In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990).  "In the absence of such a decision, a
federal court must predict how the highest state court would decide the issue using
intermediate appellate court decisions, decisions from other jurisdictions, statutes,
treatises, and restatements as guidance."  *Id.* at 1239.  "However, in the absence of
convincing evidence that the highest court of the state would decide differently, a federal
court is obligated to follow the decisions of the state's intermediate courts."  *Id.* (internal
citations and quotation marks omitted).

In *Reynolds*, the disputed issue was whether the estate of a decedent could assert a

"right of publicity" claim against one of the decedent's children for writing an online magazine article that described the decedent's "daily challenges with independent living." 327 P.3d at 214.  After the trial court dismissed the claim, "ruling the estate had 'no Right of Publicity,'" the estate appealed.  *Id.*  Although the Arizona Court of Appeals affirmed, it did so on different grounds than those provided by the trial court.  Specifically, in Part A of its opinion, the appellate court expressly held "that an individual has a right of publicity that protects his or her name and/or likeness from appropriation for commercial or trade purposes."  *Id.* at 214-16.  In reaching this conclusion, the court canvassed the law of several other jurisdictions and noted that this theory of liability is recognized under the Restatement (Third) of Unfair Competition, which Arizona generally follows.  *Id.*  Next, in Part B of its opinion, the appellate court held that the decedent's claim did not expire upon her death and instead passed to the estate.  *Id.* at 216-17.  Finally, in Part C of its opinion, the appellate court held that the estate's claim was foreclosed by § 47 of the Restatement, which exempts "expressive works" from liability, because the challenged article was "on the order of an unauthorized biography" as opposed to "for purposes of trade."  *Id.* at 217-18.  In a paragraph entitled "Conclusion" at the very end of the opinion, the appellate court summarized its holding as follows: "We hold that Arizona recognizes a right of publicity. . . .  It is not limited to celebrities and it need not be exploited during life to be asserted in death."  *Id.* at 218.

As this summary makes clear, the *Reynolds* court's recognition of the "right of publicity" as a cognizable theory of tort liability under Arizona law cannot be disregarded as dicta.  The court's statements on this issue provided one of the grounds for the court's ultimate decision and the court made clear that it intended for those statements to have binding, prospective effect.  Under Arizona law, this means those statements weren't dicta. *See, e.g., Phelps Dodge Corp. v. Ariz. Dep't of Water Resources*, 118 P.3d 1110, 1116 (Ariz. Ct. App. 2005) (where an opinion's "language indicates an express declaration that the court intended its finding not merely as an expostulation . . .  but as a rule to guide [future conduct] . . .  [it] should be followed absent a cogent reason for departing from it");

1   *Pioneer Annuity Life Ins. Co. v. Rich*, 880 P.2d 682, 685 (Ariz. Ct. App. 1994) ("When

2   . . . a court relie[s] on both grounds discussed in the opinion . . . , neither holding is

3   dictum.") (citation and internal quotation marks omitted); *State v. Fahringer*, 666 P.2d 514,

4   515 (Ariz. Ct. App. 1983) ("An expression which might otherwise be regarded as dictum

5   becomes an authoritative statement when the court expressly declares it to be a guide for

6   future conduct."). Many other judges of this Court have reached the same conclusion. *See,*

7   *e.g., Geiger v. Creative Impact Inc.*, 2020 WL 3545560, *7 n.6 (D. Ariz. 2020)

8   ("[T]he [*Reynolds*] court's determination that there is a cause of action for appropriation is

9   not obiter dictum as Defendant argues."); *Skinner v. Tuscan Inc.*, 2020 WL 5946898, *7

10  (D. Ariz. 2020) (same); *Pepaj v. Paris Ultra Club LLC*, 2021 WL 632623, *7 (D. Ariz.

11  2021) (same).

12          Finally, although further analysis is unnecessary in light of the Court's obligation to

13  follow *Reynolds*,[4] there are three additional reasons why Plaintiffs' right of publicity claims

14  should be deemed cognizable under Arizona law.

15          First, "even if the claim had not been recognized in Arizona, Arizona courts apply

16  the Restatement so long as there is no law to the contrary." *Geiger*, 2020 WL 3545560 at

17  *7 (*citing Ft. Lowell-NSS Ltd. P'ship v. Kelly*, 800 P.2d 962, 968 (Ariz. 1990)). The right

18  of publicity is clearly recognized in § 46 of the Restatement (Third) of Unfair Competition,

19  so even without the benefit of *Reynolds*, the right of publicity would be a common-law

20  cause of action in Arizona, sans law to the contrary.

21          Second, "[a]bsent a clear manifestation of legislative intent to displace a common-

22  law cause of action," the Arizona Supreme Court "interpret[s] statutes with every

23  intendment in favor of consistency with the common law." *Orca Commc'ns Unlimited,*

24  *LLC v. Noder*, 337 P.3d 545, 547 (Ariz. 2014). Defendant contends that A.R.S. § 12-761,

25  which pertains to a soldier's right of publicity, demonstrates that the right of publicity in

26

27  ─────────────

    4       During oral argument, Defendant's counsel stated that the Arizona Court of Appeals
28  is currently considering, in a different case, whether right of publicity claims are cognizable
    outside the military context. If the court in that case issues a published decision that is
    inconsistent with *Reynolds*, Defendant may file a motion for reconsideration on that basis.

Arizona is "a military-only right."  (Doc. 50 at 8.)  But far from containing "a clear manifestation of legislative intent to displace a common-law cause of action," *Noder*, 337 P.3d at 547, the statute in question expressly provides that "[t]he rights and remedies provided in this section supplement any other rights and remedies provided by law, including the common law right of privacy."  A.R.S. § 12-761(E).  As such, it cannot be argued that A.R.S. § 12-761 interferes with the common-law right of privacy, which "Arizona long has recognized," or with the common-law right of publicity, which protects an individual's "name and/or likeness from appropriation for commercial or trade purposes."  *Reynolds*, 327 P.3d at 215-216.

Third, the Arizona Supreme Court does not approve jury instructions.  *State v. Logan*, 30 P.3d 631, 633 (Ariz. 2001).  Thus, even assuming that jury instructions could ever be useful to a federal court when interpreting state law, they cannot trump a holding of the Arizona Court of Appeals.

b.     **Statute Of Limitations**

Defendant also seeks summary judgment on the right of publicity claims in Count I (except for Longoria's) because such claims are akin to claims for invasion of privacy and are thus subject to A.R.S. § 12-541's one-year statute of limitations.  (Doc. 50 at 21-22.) Plaintiffs respond that (1) Defendant hasn't established that a one-year limitations period should apply to right of publicity claims, and alternatively (2) the limitations period is subject to tolling "pursuant to the continuous tort doctrine."  (Doc. 62 at 17-18.)

Defendant is not entitled to summary judgment on the claims in Count I based on the expiration of the statute of limitations.  It is true that, in *Reynolds*, the Arizona Court of Appeals observed that "[v]iolation of the right of publicity . . . originally was one of the four varieties of invasion of privacy."  327 P.3d at 214-15.  However, the court then went on to note that "[t]he 'right of publicity' at issue here is defined by the [Restatement (Third) of Unfair Competition § 46] as the right to the 'commercial value of a person's identity.'" *Id.* at 215.  "Under this provision, '[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of

identity for purposes of trade is subject to liability' for resulting damages." *Id.*  The court saw "no reason to depart from the Restatement Third in this matter" and therefore held "that an individual has a right of publicity that protects his or her name and/or likeness from appropriation for commercial or trade purposes." *Id.* at 216.

Given this backdrop, it is appropriate to look to the Restatement to discern the essential nature of a "right of publicity" claim.  Comment b to the Restatement (Third) § 46 explains that although "[t]he principal historical antecedent of the right of publicity is the right of privacy," "[c]ourts in a number of jurisdictions eventually came to distinguish claims for injury to personal feelings caused by an unauthorized use of the plaintiff's identity from claims seeking redress for an appropriation of the commercial value of the identity." *Id.*  "The latter claim was sometimes denominated a 'right of publicity' to distinguish it from the protection available to personal interests under the 'right of privacy.'" *Id.*  Critically, "[t]he distinction between the publicity and privacy actions . . . relates primarily to the nature of the harm suffered by the plaintiff." *Id*.

Comment g to the Restatement (Third) § 46 further clarifies this distinction.  Comment g explains "[t]he interest in the commercial value of a person's identity is in the nature of a property right." *Id.  See also Reynolds*, 327 P.3d at 215 ("Rooted in recognition of the commercial value of an individual's name or likeness, the right of publicity is in the nature of a property right.").  In contrast, privacy-based claims are more akin to personal injury claims: "[T]he tort of appropriation affords redress of commercial injuries, by contrast to personal injuries of the sort remedied by a claim for, e.g., invasion of privacy by intrusion or publication of private facts." *Reynolds*, 327 P.3d at 215.

Here, Count I is specifically denominated as a claim based on the "right of publicity."   The best reading of *Reynolds* and the Restatement (Third) of Unfair Competition § 46 is that this is a property-based tort claim, not a personal injury-based tort claim.  And under Arizona law, property-based tort claims are subject to A.R.S. § 12-542's two-year statute of limitations, not A.R.S. § 12-541's one-year limitations period.  Accordingly, Plaintiffs' claims in Count I are not time-barred.  *See also Skinner*, 2020 WL

1    5946898 at *8 ("[T]he Arizona Court of Appeals determined that the right of publicity is

2    rooted in property, not privacy. . . .  [I]f the right of publicity is deemed based in property,

3    in Arizona property torts are not subject to a one-year statute of limitations.") (citations

4    omitted); *Pepaj*, 2021 WL 632623 at *8 (same).

5                         c.    **Liability**

6        "Under Arizona law, '[o]ne who appropriates the commercial value of a person's

7    identity by using without consent the person's name, likeness, or other indicia of identity

8    for purposes of trade is subject to liability' for resulting damages."  *Geiger*, 2020 WL

9    3545560 at *8 (quoting *Reynolds*, 327 P.3d at 215).

10        Plaintiffs assert they are entitled to summary judgment on Count I, except as to the

11    extent of their damages, because "[t]here is no material dispute that Defendant used each

12    Plaintiff's identity in their advertisements; that they sought and obtained a commercial

13    advantage by using these identities by, at minimum, getting Plaintiffs to appear for free in

14    these advertisements; that no Plaintiff has ever been employed by, contracted with or has

15    otherwise given permission or consent to Defendant to use her Image to advertise, promote,

16    market or endorse Great Alaskan; and that each Plaintiff was injured by, at minimum, being

17    denied the fair market revenue she would have received but for Defendant's

18    misappropriations." (Doc. 49 at 7.)  Notably, Defendant doesn't contest these assertions—

19    the arguments regarding Count I in Defendant's motion papers are limited to the issues of

20    cognizability and timeliness.  (Doc. 50 at 2, 21-22; Doc. 61 at 7-9.)  Moreover, Defendant

21    admits it used Plaintiffs' photographs in its online advertisements because Plaintiffs are

22    "beautiful women."  (Doc. 50 at 1, 15.)

23        On this record, Plaintiffs are entitled to summary judgment on Count I, except as to

24    the amount of damages.  Plaintiffs have submitted undisputed evidence that Defendant

25    appropriated their images, without consent, for purposes of trade.  *Cf. Skinner*, 2020 WL

26    5946898 at *8 (plaintiffs entitled to summary judgment on right of publicity claims where

27    defendant only contested cognizability and timeliness).  And "although Defendant states

28    repeatedly that the acquired photos were 'publicly available,' it offers no evidence that it

had consent to publish" them.  *Id.* at *8.  As Plaintiffs note, "basically all websites are 'publicly available,'" but Defendant has brought forth no evidence suggesting that Plaintiff's images were "publicly available" to Defendant "for licensing and use."  (Doc. 64 at 15.)  Finally, as for resulting injury, Plaintiffs have established that they were denied the fair market value of their photographs.  *Gray v. LG&M Holdings LLC*, 2020 WL 6200165, *4 (D. Ariz. 2020) (granting summary judgment because "[i]t is beyond controversy that the failure to pay any Plaintiff for the use of her Image harmed each Plaintiff"); *Pepaj,* 2021 WL 632623 at *9 ("The quantity of Plaintiffs' damages remains a triable issue of fact.  Plaintiffs sufficiently allege that their damages are, 'at minimum,' the fair market value of their images.  But Plaintiffs' briefing suggests that Plaintiffs may seek additional damages on their right of publicity claims.  Accordingly, the Court will grant summary judgment in Plaintiffs' favor as to liability on the right of publicity, but the measure of each Plaintiff's damages remains a question of fact for trial.").  *See generally* Restatement (Third) Unfair Competition § 49 (identifying different theories of possible recovery, including recovery based on fair market value of unauthorized use).  Indeed, even Defendant's proposed expert acknowledges that the images in question had a fair market value of more than zero.  (Doc. 66 at 62.)

### 2.   Count III: False Light Invasion Of Privacy

#### a.   **Statute of Limitations**

In Count III of the complaint, Plaintiffs Pinder, Hinton, Canas, and Longoria assert claims for "False Light Invasion of Property."  (Doc. 1-3 at 18-19.)  As with Count I, Defendant contends it is entitled to summary judgment on these claims (except for Longoria's) because they are subject to a one-year statute of limitations under A.R.S. § 12-541.  (Doc. 50 at 22-23.)  Plaintiffs, in turn, concede that "Defendant is correct that a false light claim has a one-year statute of limitations" but argue that the claims in Count III are not time-barred because they are subject to tolling under the "continuous tort doctrine." (Doc. 62 at 17.)

Plaintiffs' concession that their claims in Count III are subject to a one-year statute

of limitations creates a dilemma.  On the one hand, the case that both parties cite in support

of this conclusion, *Watkins v. Arpaio*, 367 P.3d 72 (Ariz. Ct. App. 2016), may be

distinguishable.  There, the Arizona Court of Appeals concluded that because the plaintiff

"did not cite any actionable statement [Sheriff] Arpaio made concerning him within a year

of filing his lawsuit, the superior court did not err in dismissing the claim for invasion of

privacy by false light."  367 P.3d at 77.  But the *Watkins* court's determination that the

claim was time-barred had nothing to do with the nature of the cause of action.  Rather, it

was due to the fact that Sheriff Arpaio was a public employee:

> Watkins's claim . . . is subject to Arizona statutes that expressly govern the accrual of "all actions" against a public entity or public employee.  Under A.R.S. § 12-821, "All actions against any public entity or public employee shall be brought within one year after the cause of action accrues and not afterward."

*Id.* at 76.  Thus, *Watkins* doesn't appear to address which statute of limitations should apply

when, as here, a false light invasion of privacy claim is brought against a defendant who

isn't a public entity or public employee.

On the other hand, the Court takes seriously "the principle of party presentation,"

which holds that courts "should not[] sally forth each day looking for wrongs to right" and

instead should "wait for cases to come to [them] . . . [and] normally decide only questions

presented by the parties."  *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020)

(citations and internal quotation marks omitted).  Here, the Court is faced with the task of

plowing through hundreds of pages of briefing on three motions to exclude expert opinions

and two cross-motions for summary judgment, each of which raises an array of issues and

sub-issues.  The Court therefore concludes, in its discretion, that the proper course of action

is to accept Plaintiffs' concession that the claims in Count III are subject to a one-year

statute of limitations, when the only alternatives would be to address this state-law issue

without the benefit of adversary briefing or to further delay the resolution of this case

(which has already been pending for more than two and a half years) so that supplemental

briefing may be solicited.

The only ground that Plaintiffs have articulated for avoiding this time bar is that

their claims are subject to tolling pursuant to the continuous tort doctrine.  (Doc. 62 at 17-18.)  But in *Watkins*, the Arizona Court of Appeals specifically held that "[w]e are unaware of any authority compelling the conclusion that a false-light claim is subject to the 'continuing wrong' doctrine."  367 P.3d at 77.  *See also Gray*, 2020 WL 6200165 at *4-5 ("No existing Arizona law has applied the continuous violation doctrine to a false light claim, and it is not the Court's place to be the first."); *Geiger,* 2020 WL 3545560 at *6 (same).  The case cited in Plaintiffs' brief does not compel a different result, as it did not involve the application of Arizona law.

Accordingly, Defendant is entitled to summary judgment on the claims for "False Light Invasion of Property" asserted by Pinder and Hinton in Count III of the complaint, because all of the challenged advertisements pertaining to these two Plaintiffs were published before June 1, 2017 (*i.e.,* more than a year before the complaint was filed).  In contrast, Defendant concedes that Longoria's claim in Count III is not time-barred because the challenged advertisements involving her were published after June 1, 2017.  (Doc. 50 at 22.)  Finally, although Defendant asserts that all of the challenged advertisements pertaining to Canas were published before June 1, 2017, this assertion is inaccurate—Canas identifies an array of different challenged advertisements, some of which were published as early as May 2017 (time-barred) and some of which were published as late as December 2017 (not time-barred).  (Doc. 1-3 ¶ 42.)  Thus, Defendant is not entitled to an across-the-board grant of summary judgment on Canas's claim in Count III.

### b.    Elements Of False Light Invasion Of Privacy Claim

Longoria and Canas move for summary judgment on their timely claims for false light invasion of privacy in Count III, arguing that the undisputed evidence shows they can establish each element of their claims.  (Doc. 49 at 20-21.)  Defendant opposes this request (Doc. 61 at 12-13) and also affirmatively moves for summary judgment on the grounds that (1) the challenged publications didn't involve a "major misrepresentation" concerning either Plaintiff's character, history, activities, or beliefs; (2) Longoria and Canas can't prove it acted with the requisite "knowing or reckless" mindset; (3) a plaintiff asserting a

false light claim can only recover emotional distress damages, which Longoria and Canas haven't claimed here; and (4) Longoria's and Canas's asserted status as "celebrities" precludes them from asserting false light claims. (Doc. 50 at 18-21.)

Under Arizona law, a claim for false light invasion of privacy appears to have the following elements:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 784 (Ariz. 1989) (quoting Restatement (Second) of Torts § 652E); *see also id.* at 788 ("[W]e are persuaded to recognize the distinct tort of false light invasion of privacy as articulated by Restatement § 652E."). "[T]o qualify as a false light invasion of privacy, the publication must involve 'a major misrepresentation of [the plaintiff's] character, history, activities or beliefs,' not merely minor or unimportant inaccuracies." *Id.* at 787 (quoting Restatement (Second) of Torts § 652E cmt. c.).

### i.   Major Misrepresentation, Highly Offensive

It is beyond dispute that Defendant's posting of Longoria's and Canas's photos in online advertisements for a strip club constitutes giving publicity. The parties dispute whether these advertisements placed Longoria and Canas in a false light, and if so, whether they involved a "major misrepresentation" of Longoria's and Canas's character, history, activities, or beliefs. Defendant argues there can be no false light because the photographs in the advertisements were photographs that Longoria and Canas had previously allowed to published in other contexts and "were not manipulated in any way—other than to add the picture of the woman to an advertising flier." (Doc. 50 at 20.) But it is exactly this— adding the pictures to the advertising fliers—that may have placed Longoria and Canas in

a false light. "[W]hen the publication of true information creates a false implication about the individual . . . , the false innuendo created by the highly offensive presentation of a true fact constitutes the injury." *Godbehere*, 783 P.2d at 787.

In *Godbehere*, the Arizona Supreme Court identified the Seventh Circuit's decision in *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128 (7th Cir. 1985), as providing a "good example of a false light cause of action based on implication." 783 P.2d at 787 n.2. The court elaborated:

> In *Douglass,* the plaintiff posed nude, consenting to the publication of her photographs in *Playboy* magazine. Her photographer subsequently left the employ of *Playboy* for *Hustler* magazine, a publication of much lower standing in the journalistic community. He sold her photographs to *Hustler,* which published them. The plaintiff sued for the nonconsensual use of the photographs. Plaintiff had no cause of action for defamation, because essentially, there was nothing untrue about the photographs. She posed for them and, as published, they did not misrepresent her. She also had no claim for outrage. She voluntarily posed for the photographs and consented to their publication in *Playboy.* Publication was not "outrageous," as it may have been if she were photographed without her knowledge and the photos published without her initial consent. However, the court upheld her recovery for false light invasion of privacy. The jury may have focused on the differences between *Playboy* and *Hustler* and concluded that to be published in *Hustler,* as if she had posed for that publication, falsely placed her in a different light than the *Playboy* publication.

*Id.*

If placing nude photos intended for one magazine featuring nude women in a different magazine featuring nude women that has "lower standing in the journalistic community" can constitute false light, the Court has no trouble concluding that placing provocative photos that were not intended for promoting a strip club in promotions for a strip club can likewise constitute false light. A jury could conclude that the implication that Longoria and Canas posed for the ads was "a major misrepresentation" of their activities as models. A jury also could conclude that the implication that Longoria and Canas worked at the club was "a major misrepresentation." Regardless of whether a woman poses provocatively in other contexts, the implication that she endorses (or perhaps even strips at) a strip club could be found to be "highly offensive to a reasonable person." If the jury finds that the advertisements convey the impression that Longoria and Canas

- 16 -

were strippers at Defendant's club, the jury may find the "highly offensive" element more easily met. Genuine issues of material fact exist as to each of these elements. *See, e.g., Geiger*, 2020 WL 3545560 at *2 ("[T]here is a triable issue as to whether being associated with Defendant's strip club would be highly offensive to a reasonable person in each of the Plaintiffs' positions."); *Skinner,* 2020 WL 5946898 at *4 ("The Court agrees with the district judge in [*Geiger*] that simply because a woman has modeled in risqué clothing (or even previously worked at a strip club) does not mean a reasonable person in a similar position could not be offended by the suggestion that the person is an exotic dancer at the defendant's strip club. . . . Whether the use of Plaintiffs' images in association with Ten's is highly offensive is a genuine issue precluding summary judgment."); *Pepaj*, 2021 WL 632623 at *6 (denying defendant's motion for summary judgment in similar action because it "conflate[d] consent to take a photograph for a discrete purpose with consent that the image be used in connection with an unrelated business").

### ii.   Actual Malice

The next element is whether Defendant had "knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Godbehere*, 783 P.2d at 784. This appears to make "actual malice"[5] an element of any false light claim under Arizona law. *See, e.g.*, *Rogers v. Mroz*, 479 P.3d 410, 426 (Ariz. Ct. App. 2020) ("A false light claim requires actual malice."); *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015) ("To establish a claim for false light invasion of privacy, a plaintiff must show (1) the defendant, *with knowledge of falsity or reckless disregard for the truth*, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position.") (emphasis

---

[5]    "Actual malice" is "a term of art and an unfortunate misnomer—it is unrelated to the ordinary meaning of malice as ill will." *Tennenbaum v. Arizona City Sanitary Dist.*, 2015 WL 7731820, *5 (D. Ariz. 2015). "Actual malice" means "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

added).[6]

   "[W]here the factual dispute concerns actual malice . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Scottsdale Pub., Inc. v. Superior Court In & For Cty. of Maricopa*, 764 P.2d 1131, 1142 (Ariz. Ct. App. 1988) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)).   "The proof of 'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 (1979) (citation omitted).

   Plaintiffs contend that "[a]s to knowledge of falsity, there is no question Defendant knew no Plaintiff worked as a stripper at [Defendant's club] or was hired to promote or sponsor same . . . ." (Doc. 49 at 20.)  This is true.  However, Defendant never published a statement affirmatively declaring that Longoria and Canas were strippers at (or were

---

   [6]     Although *Rogers* and *Petta* suggest that "actual malice" is always required in a false light action under Arizona law, the underpinnings of this approach are somewhat murky. In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the U.S. Supreme Court formulated the "actual malice" standard as a constitutional restriction on the States' power to award tort damages in one specific type of case—defamation actions brought by public officials against critics of their official conduct.  Later, the Supreme Court held that this constitutional restriction was also required in the somewhat related context of state-law tort actions brought by public figures for intentional infliction of emotional distress. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).  This backdrop is informative because *Godbehere*, which was decided only one year after *Falwell*, also involved a claim brought by public officials concerning reports that criticized their official acts.  783 P.2d at 783.  It is therefore understandable why the *Godbehere* court stated, when identifying the elements of a claim for false light invasion of privacy, that the plaintiff must prove the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* at 784.  Indeed, in a footnote, the court explained that it was including this requirement because "in this case, where we deal with publications concerning public officers performing public duties, the first amendment controls" and clarified that it took "no position" on what liability standard would govern a claim by "a non-public figure" for "false light invasion of privacy" "[b]ecause this case does not present the issue." *Id.* at 789 n.6.  Nevertheless, *Rogers* and *Petta* state that the elements identified in *Godbehere* apply to all claims for false light invasion of privacy, seemingly irrespective of the plaintiff's status as a public (or non-public) official or figure.  Respectful of its role as a federal court applying state law, the Court will follow that approach here.  That approach also makes it unnecessary to decide whether Longoria and Canas are, in fact, public figures—an undertaking the Arizona Supreme Court has described as "much like trying to nail a jellyfish to the wall." *Dombey v. Phoenix Newspapers, Inc.*, 724 P.2d 562, 569 (Ariz. 1986).

otherwise hired to promote) its club.  The advertisement plausibly implied as much, but where the false light derives from an implication, actual malice requires that the defendant knew or recklessly disregarded the existence of the implication.  In other words, it isn't enough that Defendant knew that Longoria and Canas didn't work for its club and hadn't endorsed it—Defendant must have known (or to have considered and then recklessly disregarded the possibility) that the advertisements could convey that message.  *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1085-86 (9th Cir. 2002).

Whether Defendant "entertained serious doubts" that the advertisements conveyed such a message "may be proved by inference, as it would be rare for a defendant to admit such doubts." *Id.*  Plaintiffs have produced the advertisements themselves (Doc. 49-2)— from which a fact-finder can draw his or her own inferences—as well as a survey and expert report indicating that some viewers of the advertisements had false impressions of Longoria, Canas, and the other Plaintiffs after viewing the ads (Doc. 49-9).  The Court is satisfied that "the evidence in the record could support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence." *Scottsdale Pub*, 764 P.2d at 1142.  Thus, neither side is entitled to summary judgment—the question of actual malice presents a jury issue. *See, e.g., Geiger*, 2020 WL 3545560 at *4 ("[T]here is a dispute of material fact as to whether Defendant posted the flyers with Plaintiffs' images with knowledge or reckless disregard for the truth (i.e., actual malice).");  *Skinner,* 2020 WL 5946898 at *5 ("Whether this [advertisement] was in reckless disregard to the truth depends upon a fact finder's determination of the postings' degree of innuendo (whether they placed Plaintiffs in a false light) and offensiveness (whether the false light was highly offensive to a similarly situated person).  These are material factual issues.").

### iii.   Damages

Defendant argues that "the tort of false light does not provide redress for injury to a plaintiff's reputation; it only provides for . . . emotional damages . . . ."  (Doc. 50 at 21.) Plaintiffs somewhat surprisingly fail to address this issue in their response.  (Doc. 62 at 14-16.)

Defendant's argument rests on a false premise.  Although the Arizona Supreme Court in *Godbehere* noted that "the gravamen of a privacy action . . . is the injury to the feelings of the plaintiff, the mental anguish and distress caused by the publication" and observed that "[p]rivacy . . . does not protect reputation but protects mental and emotional interests," 783 P.2d at 787, the Court does not interpret those statements as foreclosing a plaintiff from seeking damages for reputational harm in an action for false light invasion of privacy.  Indeed, the *Godbehere* court went on to state that "a plaintiff may recover even in the absence of reputational damage."  *Id.*  This formulation suggests that a plaintiff asserting a false light invasion of privacy claim may seek *both* reputational *and* emotional distress damages.  Comment a of § 652H of the Restatement (Second) of Torts, which sets forth the damages available in a false light invasion of privacy action, supports this interpretation.  It provides that "[o]ne who is publicly placed in a false light, under § 652E, may recover damages for the harm to his reputation from the position in which he is placed."  Thus, even though Longoria and Canas have not put forth any evidence suggesting they suffered mental distress—their declarations are silent on this point—Defendant is not entitled to summary judgment based on the absence of provable damages.  *Cf. Geiger*, 2020 WL 3545560 at *6 (denying defendant's motion for summary judgment, premised on the argument that plaintiffs couldn't prove any emotional injury, because "once a plaintiff establishes a false light claim, it is in the province of the finder of fact to consider any actual damage to a plaintiff's reputation and/or any emotional damage or damage to sensibility") (quotation marks and brackets omitted); *Pepaj*, 201 WL 632623 at *7 (same).

### iv.   Public Official

Defendant's final summary judgment argument is that, because "the Arizona Supreme Court [has] specifically held that the right of privacy does not exist where the plaintiff has become a public character" yet "Plaintiffs all 'claim' to be celebrities," these assertions preclude the imposition of liability.  (Doc. 50 at 21 [cleaned up].)  Once again, Plaintiffs surprisingly fail to address this argument in their response.

Defendant's argument is unavailing.  In *Godbehere*, the Arizona Supreme Court held that the plaintiffs' false light invasion of privacy claims were not actionable because the plaintiffs were all law enforcement officials, the challenged reports concerned their official activities, and "[i]t is difficult to conceive of an area of greater public interest than law enforcement.  Certainly the public has a legitimate interest in the manner in which law enforcement officers perform their duties."  783 P.2d at 789.  Thus, the court adopted the following legal standard:

> [A] plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties.  We do not go so far as to say, however, that a public official has no privacy rights at all and may never bring an action for invasion of privacy.  Certainly, if the publication presents the public official's private life in a false light, he or she can sue under the false light tort, although actual malice must be shown.

*Id.*  The court also clarified that "the public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* (citation and quotation marks omitted).

Here, there can be no serious argument that Longoria and Canas are "public officials."  They are not government employees and do not have substantial responsibility or control over the conduct of government affairs.  Although the record reflects that Longoria and Canas each considers herself to have "earned elite status as a social media celebrity" due to her high number of followers on Instagram (Doc. 49-3 ¶ 3; Doc. 49-7 ¶ 3), being "Instagram famous" isn't tantamount to being a public official.

B.   **Federal Claims**

Section 43(a) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A)   is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

1

2

3

        (B)      in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

4

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

5

6

15 U.S.C. § 1125(a)(1).

7

     "Section 1125(a) thus creates two distinct bases of liability: false association,

8

§ 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static*

9

*Control Components, Inc.*, 572 U.S. 118, 122 (2014).

10

     Defendant argues that Plaintiffs did not plead or disclose a false advertising claim.

11

(Doc. 50 at 15.)   This is bewildering, because the complaint specifically cites

12

§ 1125(a)(1)(B) (Doc. 1-3 ¶ 57) and twice refers to Defendant's conduct as "false

13

advertising" (*id.* ¶¶ 60, 62).

14

     In contrast, the complaint never references § 1125(a)(1)(A) or uses the term "false

15

association."   The complaint's allegations, however, allude to such a claim: "Defendants

16

used Plaintiffs' images, likenesses and/or identities as described herein without authority

17

in order to create the perception that the Plaintiffs[] worked at or [were] otherwise affiliated

18

with the Defendant Club, endorsed the Club or the Club's business activities, and/or

19

consented to or authorized Defendants' or the Club's usage of their images in order to

20

advertise, promote, and market the Defendant Club and Defendants' business activities."

21

(*Id.* ¶ 58.)   At any rate, both parties assume that Count II incudes a false association claim.

22

(Doc. 49 at 13-20; Doc. 50 at 9-15.)   The Court therefore concludes that Count II comprises

23

both a false advertising claim under § 1125(a)(1)(B) and a false association claim under

24

§ 1125(a)(1)(A).   Each claim is addressed below.

25

     …

26

     …

27

     …

28

     …

1          1.      <u>False Association</u>

A Lanham Act claim for false association under § 1125(a)(1)(A) has the following elements:

> (1)    The defendant used a word, term, name, symbol, or device (or any combination thereof) or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact;
>
> (2)    The usage was in commerce, in connection with goods or services;
>
> (3)    The usage is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person; and
>
> (4)    The plaintiff believes he or she is or is likely to be damaged as a result of the usage.

*See* 15 U.S.C. § 1125(a)(1)(A).

"The first two elements are met by the undisputed fact that Defendant used photos of Plaintiffs in commerce." *Gray*, 2020 WL 6200165 at *6. Neither side addresses the fourth element, which is whether Plaintiffs "believe[]" they are "damaged" or "likely to be damaged" as a result of the usage. 15 U.S.C. § 1125(a)(1)(A). Defendant limits its argument for summary judgment to the third element, likelihood of confusion. (Doc. 50 at 9-15.) The question is whether Defendant's usage of Plaintiffs' photographs in the online advertisements for Defendant's strip club was likely to confuse viewers of the ads into believing that Plaintiffs were affiliated, connected, or associated with the club or that Plaintiffs sponsored or approved of the club's goods, services, or commercial activities.

The Court's analysis regarding likelihood of confusion is guided by the eight-factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979):

> (1)    Strength of the mark;
>
> (2)    Proximity of the goods;
>
> (3)    Similarity of the marks;
>
> (4)    Evidence of actual confusion;

1        (5)     Marketing channels used;

2        (6)     Type of goods and the degree of care likely to be exercised by the

3                 purchaser;

4        (7)     Defendant's intent in selecting the mark; and

5        (8)     Likelihood of expansion of the product lines.

*See also White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992), *as amended* (Aug. 19, 1992) (applying *Sleekcraft* factors to celebrity endorsement action).[7]

### a. **Strength Of The Mark**

"In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona." *White,* 971 F.2d at 1400. "The 'strength' of the mark refers to the level of recognition the celebrity enjoys among members of society." *Id.*

This factor presents a genuine dispute of material fact. Each Plaintiff enjoys some degree of celebrity, measurable by, for example, the number and prominence of the appearances each Plaintiff has had in magazines, films, advertisements, or other publicly viewable settings, the number of followers each Plaintiff has on social media, and/or the degree to which people recognize her. Plaintiffs have brought forth evidence as to their modeling and other celebrity appearances and social media followings in the form of declarations. (Doc. 49-3, 49-4, 49-5, 49-6, 49-7.) Additionally, Plaintiffs' expert Martin Buncher indicated in his report that, on average, 15% of the 300 people who responded to a survey he conducted recognized Plaintiffs, with a range of recognition between 13% and 24%. (Doc. 49-9 at 19.) It is within the province of the jury to weigh this evidence and determine the strength of each Plaintiff's mark. *See, e.g., Gray,* 2020 WL 6200165, at *6 ("The jury could conclude that since 16% of respondents recognized Plaintiffs, Plaintiffs are sufficiently recognizable; or it could conclude than since 84% of respondents did not

---

[7]    "[T]he *sine qua non* of trademark infringement is consumer confusion, and . . . the *Sleekcraft* factors are but a nonexhaustive list of factors relevant to determining the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1142 (9th Cir. 2011). The *Sleekcraft* test should be applied "in a flexible manner, keeping in mind that the eight factors it recited are not exhaustive, and that only some of them are relevant to determining whether confusion is likely in the case at hand." *Id.* at 1145.

recognize Plaintiffs, Plaintiffs are too obscure.  Or the jury could attribute little weight to any percentages from Mr. Buncher's survey based on problems with the representativeness of the sample or other problems with the methodology.").

### b.     Proximity Of The Goods

"In cases concerning confusion over celebrity endorsement, the plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame."  *White*, 971 F.2d at 1400.  For example, in a case in which Vanna White, "the hostess of 'Wheel of Fortune,' one of the most popular game shows in television history," sued an electronics company for using her likeness to advertise video cassette recorders, the Ninth Circuit concluded that "[b]ecause White's fame is based on her televised performances, her 'goods' are closely related to Samsung's VCRs" and "the ad itself reinforced the relationship by informing its readers that they would be taping the 'longest-running game show' on Samsung's VCRs well into the future."  *Id.* at 1396, 1400.  Obviously, Vanna White was not engaged in the business of making or selling VCRs.  But "television" was the thematic link that connected White and VCRs.

The source of Plaintiffs' fame is their beauty and sex appeal, and Defendant's strip club is a business that emphasizes women's beauty and sex appeal.  *Gray*, 2020 WL 6200165, at *7 ("The modeling and strip-club industries share a common feature: both emphasize appearance and profit off the sexualization of women's bodies.  What makes a successful model makes for an attractive stripper.").  Many of the advertisements reinforce this relationship by making reference (explicitly or via innuendo) to the beauty and sex appeal of the women who work at the club, calling them "Beautiful Bush Babes" (Doc. 49-2 at 2, 13, 17) or including hashtags such as #hotnsexy and #hotdamn (*id.* at 3).

Defendant's sole argument is that "Plaintiffs have already argued that their fame is patently *unrelated*" to "providing entertainment at a gentleman's club."  (Doc. 50 at 13-14.)  This argument lacks merit.  Plaintiffs argue that they do not endorse or strip at Defendant's club and that they do not wish to be perceived as doing so.  They are not in the stripping business.  However, they are in a business that—like Defendant's—

capitalizes on beauty and sex appeal.  This factor favors Plaintiffs.

### c.  **Similarity Of The Marks**

Defendant used actual photographs of Plaintiffs, so this factor favors Plaintiffs. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015) (similarity of the marks undisputed because defendant "used actual photos"); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001) (similarity of the marks is "clear" where the likeness is "an actual photograph").

### d.  **Evidence Of Actual Confusion**

"A showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011).  "Evidence of actual confusion constitutes persuasive proof that future confusion is likely" for the common-sense reason that "[i]f enough people have been *actually* confused, then a *likelihood* that people are confused is established."  *Id.*  Actual confusion is a higher standard than likelihood of confusion, and as such, "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act."  *Id.*

Buncher's report demonstrates that the vast majority of survey respondents (84-88%) believed that Plaintiffs "agreed to sponsor, endorse or promote" Defendant's club, that Plaintiffs "approve[d] of the use of their image" in the advertisements, and that Plaintiffs "were paid to be in the ads."  (Doc. 49-9 at 21-22.)  If credited, this is strong evidence of actual confusion as to an "affiliation, connection, or association" between Plaintiffs and Defendant's club and/or as to Plaintiffs' "sponsorship" or "approval" of the club and its commercial activities.  Although a factfinder can decide how much weight, if any, to give Buncher's report, Defendant has produced no controverting evidence that suggests an absence of actual confusion.  Thus, this factor favors Plaintiffs.[8]

---

[8]  In *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 258 (2d Cir. 2021), the Second Circuit affirmed a grant of summary judgment in favor of the defendant on a similar Lanham Act false association claim, but *Electra* is distinguishable because the district court in that case struck the plaintiffs' survey evidence pertaining to actual confusion.  Here, Plaintiffs' survey evidence has not been stricken.

e.     **Marketing Channels Used**

"Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151.  This factor is therefore inapplicable or neutral.

f.     **Degree Of Consumer Care**

"Low consumer care increases the likelihood of confusion."  *Id.* at 1152.  "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer"—in this case, a typical patron of strip clubs—"exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353.  The buyer is expected to be more "discriminating" when he has more "expertise in the field" or when "the goods are expensive."  *Id.*

"In addition to price, the content in question may affect consumer care as well." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).  "In *Playboy,* the relevant consumer was looking for cheap, interchangeable adult-oriented material, which similarly led to [the Ninth Circuit's] finding that the consumers at issue would exercise a low degree of care."  *Network Automation*, 638 F.3d at 1152.

Here, Defendant initially stated that this factor is "somewhat irrelevant" because its advertisements "are not advertising actual goods or services for which a consumer would need to exercise care."  (Doc. 50 at 15.)  This statement seems to concede that strip club patrons exercise little to no care in selecting which strip club to patronize.  However, Defendant next asserted that "consumers that visit nightclubs are generally sophisticated consumers who are selective about which nightclubs they choose to visit."  (*Id.*)  At any rate, Defendant provides no evidence to support this assertion.

Plaintiffs have provided evidence that patronage of Defendant's club is inexpensive. For example, Defendant advertises that there is "No Cover"—meaning admission is free— and "$5 Table dances Till 7PM."  (Doc. 49-8 at 3.)  Drink specials run as low as $2.  (*Id.*) Nevertheless, whether a seeker of "adult-oriented" entertainment is generally prone to exercise a low or high degree of care in selecting a strip club such as Defendant's is a fact-

1   based determination for the jury.

2        **g.**  **Defendant's Intent In Selecting The Mark**

3     Plaintiffs assert that Defendant's intent to confuse consumers into believing that

4   Plaintiffs worked at Defendant's strip club or sponsored it is "made obvious by the subject

5   advertisements."  (Doc. 49 at 18.)  Defendant disagrees, arguing it "did not choose the

6   Plaintiffs for any reason in particular (like fame or notoriety)" and instead chose the

7   photographs in question merely because they "depicted beautiful women in risqué

8   photoshoots."  (Doc. 50 at 15.)

9     In the advertisements at issue, Defendant prominently featured Plaintiffs' photos,

10  repeatedly referenced the beauty of the women who work at the club, and included no

11  disclaimer that the beautiful women featured in the photographs were not the beautiful

12  women referenced in the text.  "[D]o[ing] nothing to alleviate confusion" and "profit[ing]

13  from confusion" provide "some evidence of an intent to confuse."  *Playboy*, 354 F.3d at

14  1029.  A jury could reasonably conclude that Defendant intended to convey the message

15  that Plaintiffs worked at the club or participated in club events.

16       **h.**  **Likelihood Of Expansion Of Product Lines**

17    "[T]he eighth factor, 'likelihood of expansion of the product lines,' does not appear

18  apposite to a celebrity endorsement case such as this."  *White*, 971 F.2d at 1401.  This

19  factor is inapplicable here.

20       **i.**  **Other Factors**

21    The *Sleekcraft* factors are "not exhaustive" and "[o]ther variables may come into

22  play depending on the particular facts presented."  *Network Automation*, 638 F.3d at 1153.

23  The "appearance of the advertisements" is important and "must be considered as a whole."

24  *Id.* at 1154.  The jury might take into consideration factors such as the layout of the

25  advertisements and the prominence of the photographs—factors that may differ from one

26  advertisement to another.

27       **j.**  **Conclusion As To Likeliness Of Confusion**

28    "The Lanham Act's 'likelihood of confusion' standard is predominantly factual in

nature." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997).  No single factor is dispositive.  *Id.*  Even where some of factors favor the defendant—which is not the case here—summary judgment "is inappropriate when a jury could reasonably conclude that most of the factors weigh in a plaintiff's favor."  *Id.*  Conversely, unless the applicable (non-neutral) factors, taken as a whole, conclusively favor the plaintiff to the extent that likelihood of confusion is established "beyond controversy," *S. California Gas*, 336 F.3d at 888, this element should not be resolved in a plaintiff's favor at summary judgment.

Although the *Sleekcraft* factors appear to tip strongly in Plaintiffs' favor, Plaintiffs have not established this element "beyond controversy."  *Id.*  The primary factor in dispute is the strength of each Plaintiff's mark.  Other areas that are not conclusively resolved in Plaintiffs' favor are actual confusion, degree of consumer care, and Defendant's intent in selecting the mark.  Furthermore, the jury will need to weigh the factors and make the ultimate determination as to likelihood of confusion.  Accordingly, neither party is entitled to summary judgment on Plaintiffs' Lanham Act claims for false association.

## 2.   False Advertising

After arguing (incorrectly) that Plaintiffs did not plead or disclose a false advertising claim (Doc. 50 at 15), Defendant devoted several pages of its motion to the argument that the false advertising claim fails on the merits.  (*id.* at 15-18.)  Plaintiffs failed to respond to these merits-based arguments in their response brief, incorrectly stating that "[s]ince Defendant has neglected to address Plaintiffs' false advertising claim in its moving brief, such claim must of course be sustained."  (Doc. 62 at 8.)  Plaintiffs then offered a belated response to Defendant's merits-based arguments in their reply in support of their own motion for summary judgment.  (Doc. 64 at 5-7.)  This procedurally improper approach deprived Defendant of the opportunity to respond.  Nevertheless, the Court will consider the briefing as it stands.[9]

---

[9]    Although LRCiv 7.2(i) permits the Court to assume consent to the granting of an unopposed motion in most cases, "[a] motion for summary judgment cannot be granted simply because there is no opposition."  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

A Lanham Act claim for false advertising under § 1125(a)(1)(B) has the following elements:

(1)    The defendant made a false statement either about the plaintiff's or its own product;

(2)    The statement was made in commercial advertisement or promotion;

(3)    The statement actually deceived or had the tendency to deceive a substantial segment of its audience;

(4)    The deception is material;

(5)    The defendant caused its false statement to enter interstate commerce; and

(6)    The plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product.

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008).

Additionally, "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark,* 572 U.S. at 131-32.  Because the injury must be proximately caused by the defendant's violation of the statute, the plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133.

Plaintiffs cannot satisfy these standards here.  Plaintiffs and Defendant do not share the same consumers.  Defendant's consumers are potential patrons of strip clubs.  If any of these consumers chose to visit Defendant's strip club because they were deceived into believing that one or more Plaintiffs endorsed the club and/or worked there, this might have taken business away from another strip club, but not from Plaintiffs.  Plaintiffs' consumers are very different—they are clients who book Plaintiffs for modeling and advertising jobs, and Plaintiffs are "selective" about the jobs they take.  (Doc. 49-3 ¶ 7; Doc. 49-4 ¶ 7; Doc. 49-5 ¶ 7; Doc. 49-6 ¶ 7; Doc. 49-7 ¶ 7.)  A person in Arizona who would like to see

Plaintiffs in person, in a sexualized setting, for his or her own gratification, would meet with no success upon trying to hire Plaintiffs.

Moreover, even assuming that the deception wrought by Defendant's conduct could have theoretically caused Plaintiffs' consumers to withhold trade from Plaintiffs—by, for example, declining to book Plaintiffs for certain modeling jobs based on the false belief that Plaintiffs had stripped at and/or endorsed Defendant's club—Plaintiffs have not proffered any evidence that this actually occurred.  Under the Lanham Act, a plaintiff "cannot obtain relief without *evidence* of injury proximately caused by [the] alleged misrepresentations." *Lexmark,* 572 U.S. at 140.  *See, e.g., Pepaj*, 2021 WL 632623 at *11 (granting summary judgment to defendants on Lanham Act false advertising claims because "Plaintiffs do not offer any facts suggesting that [the club's] allegedly false advertising caused consumers to withhold trade from Plaintiffs").

Finally, to the extent Plaintiffs suggest they have "suffered an injury to their commercial interests in sales by not getting paid for Defendant's use of their image" (Doc. 64 at 6), that is not the kind of injury contemplated by a Lanham Act false advertising claim.  The injury must be "proximately caused by [the] alleged misrepresentations." *Lexmark,* 572 U.S. at 140.  Defendant's failure to pay Plaintiffs was not *caused by* misrepresentations.

C.   **Collateral Estoppel**

Defendant argues that "non-mutual defensive collateral estoppel" should apply to Plaintiffs Hinton, Canas, and Pinder.  (Doc. 50 at 23-24.)

"[T]he party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992).  "It is not enough that the party introduce the decision of the prior court; rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated." *Id.*

Here, clarity is wholly lacking.  *Cf. Pepaj,* 2021 WL 632623 at *11 (rejecting collateral estoppel claim in similar action due to inadequacy of defendant's evidentiary

submissions).  As one example, the heading of this two-page section names "Plaintiffs Posada, Golden, and Gibson"—none of whom are Plaintiffs in this action.  Defendant points to several cases but leaves the Court guessing as to the details.  Hinton, Canas, and Pinder are not estopped from succeeding on any claims.

D.  **Conclusion**

As for Count I (right of publicity), summary judgment is granted in favor of Pinder, Hinton, Canas, and Longoria, but only as to liability.  The amount of damages remains a question for the jury.  As for Count II (Lanham Act), summary judgment is granted in favor of Defendant on Plaintiffs' claims for false advertising under 15 U.S.C. § 1125(a)(1)(B) but denied as to Plaintiffs' claims for false association under 15 U.S.C. § 1125(a)(1)(A). As for Count III (false light invasion of privacy), summary judgment is granted in Defendant's favor on the claims asserted by Pinder and Hinton but denied as to the claims asserted by Longoria and Canas.

Accordingly, **IT IS ORDERED** that:

(1)   Defendant's motion for summary judgment (Doc. 50) is **granted in part and denied in part**.

(2)   Plaintiffs' motion for summary judgment (Doc. 49) is **granted in part and denied in part**.

Dated this 23rd day of March, 2021.

Dominic W. Lanza
United States District Judge